HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DUSTIN T. THEOHARIS,

        Plaintiff,

    v.

KRISTOPHER RONGEN,

        Defendant.

CASE NO. C13-1345RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Defendant's motion for summary judgment and Plaintiff's motion for partial summary judgment. No party requested oral argument, and the court finds oral argument unnecessary. For the reasons stated herein, the court DENIES Plaintiff's motion for summary judgment (Dkt. # 69) and GRANTS Defendant's motion (Dkt. # 57) in part and DENIES it in part.

## II.  BACKGROUND

A peaceful arrest of a probationer in his home turned tragic when Defendant Kristopher Rongen, an officer in the Community Response Unit ("CRU") of the Washington Department of Corrections ("DOC"), and Detective Aaron Thompson of the King County Sheriff's Office confronted Plaintiff Dustin Theoharis in his bedroom at the probationer's home, then shot him repeatedly. Mr. Theoharis survived.

Mr. Theoharis contends that the officers violated his Fourth Amendment rights twice: once when they entered his bedroom and again when they shot him. He has

ORDER – 1

resolved his claims against Detective Thompson; still pending are his claims against Officer Rongen, which invoke 42 U.S.C. § 1983.

Because no clearly-established law barred Officer Rongen from entering Mr. Theoharis's bedroom, the court concludes that Officer Rongen is entitled to qualified immunity as to the unlawful entry claim. That is not the case as to the claim that Officer Rongen used excessive force when he shot Mr. Theoharis. Viewing the evidence in the light most favorable to Mr. Theoharis, the shooting constituted excessive force in violation of clearly-established Fourth Amendment law. To explain those conclusions, the court first considers the circumstances that brought the officers to Mr. Theoharis's bedroom, then considers evidence of the shooting.

**A.    Officers Knew Much About the Home Where Mr. Theoharis Lived Before They Entered.**

Cole Harrison owns and lives in a home in Auburn that the court will call the "Harrison House." Budge Decl., Ex. E (C. Harrison depo. at 4-5).[1] At all relevant times, his son, Shane Harrison, lived with him. Nicholas Harrison, another of Cole's sons, has lived at the Harrison House at various times. He has been convicted of more than one crime, and has been under DOC supervision, at least sporadically, for years.

Nicholas Harrison was under DOC supervision in October 2010. Officer Rongen and Detective Thompson visited the Harrison House then, hoping to arrest Nicholas for what Officer Rongen characterizes as "abscond[ing] from DOC supervision." Rongen Decl. ¶ 9. They encountered Shane Harrison, who told them that Nicholas was not home and consented to their search of the Harrison House.

---

[1] This order relies primarily on four sources of evidence: Officer Rongen's declaration (Dkt. # 60); the declaration of his counsel, Paul Triesch (Dkt. # 59); Mr. Theoharis's declaration (Dkt. # 64); and the declaration of his counsel, Edwin Budge (Dkt. # 67). Officer Rongen's briefs includes dozens of citations to the 79 numbered paragraphs of his declaration, and every one of those citations is unnumbered. That left the court with the burden of hunting for the paragraph or paragraphs to which those citations corresponded. The court will strike any future submission from Officer Rongen that takes the same approach.

ORDER – 2

The Harrison House is a three-level home.  A visitor entering the front door would find herself in an entryway that is contiguous with a great room consisting of an open kitchen, dining room, and living room.  Adjoining the great room and entryway, just a few steps from the front door, are side-by-side staircases: one staircase of ordinary length leading to the upper floor, and a two-step staircase leading to a lower level.  Standing in the great room, a visitor looking into the lower level would (assuming that the door at the bottom of the two steps was open) see into the rightmost portion of a laundry room.  What a visitor could not and see from that vantage or any vantage on the main floor would be a set of French doors with glass panes on the leftmost wall of the laundry room.  Those doors open to a bedroom that includes a bathroom, a kitchenette with a bar or counter, and a separate set of French doors to the exterior of the house.  The interior French doors and the exterior doorway are the only means of access to the bedroom.[2]

Officer Rongen and Detective Thompson inspected the lower-level bedroom during their October 2010 search.  Even if the room's layout had not revealed that it was a bedroom, Shane Harrison explained to the officers that a man (whose name is not in the record) lived in the bedroom.  Rongen Decl. ¶ 10.  At the time, the room contained only a couch, not a bed, but it was apparent to Detective Thompson that it served as a bedroom, Triesch Decl., Ex. 2 (Thompson depo. at 60-61), and apparent to Officer Rongen that it was a space where a third party lived, Budge Decl., Ex. A (Rongen depo. at 126-27). Detective Thompson recalls that Shane Harrison told them that the only firearms in the Harrison House belonged to the man living in the bedroom, but the officers found no weapons in October 2010.  Triesch Decl., Ex. 2 (Thompson depo. at 53-54); Budge Decl., Ex. A (Rongen depo. at 82-83).

In February 2012, Nicholas Harrison remained under DOC supervision.  For present purposes, it suffices to note that no one disputes Officer Rongen's assertion that

---

[2] The court's description of the layout of the Harrison House comes from a scale diagram, Rongen Decl., Ex. 6, photos taken shortly after the shooting, *id.* Exs. 7.1-7.27, and Officer Rongen's orienting explanations of those photos, *id.* ¶¶ 48-74.

ORDER – 3

Nicholas was in "community custody," and that a December 2011 agreement expressed the terms of that custody.  Rongen Decl. ¶ 15 & Ex. 3; *see also* RCW 9.94A.030(5) (defining "Community custody").  That agreement included this provision:

> I am aware that I am subject to search and seizure of my person, residence, automobile, or other personal property if there is reasonable cause on the part of the [DOC] to believe that I have violated the conditions/requirements or instructions above.

Rongen Decl., Ex. 3 at 3.  Among the conditions of the agreement was Nicholas's promise not to "associat[e] with drug users or drug sellers" and a promise not to possess or use controlled substances.  *Id.* at 1.

According to a February 9, 2012 DOC request to the CRU, Nicholas Harrison failed to report to the DOC as his community custody agreement required.  Rongen Decl., Ex. 5.  The DOC issued what Officer Rongen characterizes as a warrant for his arrest. Rongen Decl. ¶¶ 19-20 & Ex. 4.  The warrant includes his name and identifying information, but not his address.  Rongen Decl., Ex. 4.  It specifies that he was under "CCJ" supervision and that he had "[a]bscond[ed].  The warrant contained a checked box designating his "RISK TYPE" as "High Non-Violent," but checked neither "Yes" nor "No" next to the question "Dangerous to Law Enforcement?"  *Id.*

On February 11, 2012, after receiving the DOC request and warrant, Officer Rongen created a "CRU Referral packet" that "included [Nicholas Harrison]'s height and weight, DOC information, and criminal history" as well as photographs.  Rongen Decl. ¶ 20.  Other than the arrest warrant and a three-page referral form, the contents of the "CRU Referral packet" are not in the record.  Rongen Decl., Exs. 4-5.  It remains unclear what Officer Rongen (or any other officer) knew about Nicholas's criminal history.  Officer Rongen declares that he had "a 'closed' domestic violence case and two drug convictions, which may or may not have included violence," as well as "a dismissed robbery charge and multiple theft charges."  Rongen Decl. ¶ 13.  He does not specify what he knew of Nicholas's criminal history on February 11, 2012.

ORDER – 4

The same day, at about 3:30 p.m., Officer Rongen drove to the Harrison House to arrest Nicholas Harrison.  Rongen Decl. ¶ 21.  With him was Detective Kurt Litsjo.  *Id.*  They parked some distance from the Harrison House to observe it.  Detective Benjamin Wheeler arrived later.  Officer Rongen observed someone who resembled Nicholas enter the house.  *Id.*  He also directed an informant familiar with the occupants of the Harrison House to enter and report on who was present.  *Id.* ¶ 22.  The informant returned and stated that Nicholas, Shane, Cole, and Ashton Harrison (Cole's five-year-old grandson) were inside.  These were the same occupants who Nicholas had identified to the DOC when he reported the Harrison House as his residence earlier that month.  *Id.* ¶ 14.  While awaiting Detective Thompson's arrival, a neighbor approached Officer Rongen's car and stated that he believed that drugs were being sold from the Harrison House.  *Id.* ¶ 23.  Nothing in the record suggests that the neighbor said anything to substantiate that belief or that the officers asked him any questions to substantiate it.

Detective Thompson arrived and Officer Rongen "briefed" his team by telephone. Rongen Decl. ¶ 23.  The only evidence of what Officer Rongen said during this briefing comes from Detectives Litsjo and Wheeler, who testified that they expected a routine arrest.  Budge Decl., Ex. E (Litsjo depo.);[3] Triesch Decl., Ex. 3 (Wheeler depo. at 14) (stating that he "had no reason to think there was anything unusual or dangerous more so in this situation").  Detective Wheeler recalls that Officer Rongen told him that "about a year prior there had been a roommate [who] was keeping weapons in the house," and that it was "unclear" if that situation had been resolved.  Triesch Decl., Ex. 3 (Wheeler depo. at 15, 29).  Detective Wheeler had visited the Harrison House on at least one prior occasion, *id.* at 15-18, where he met "kids" who were "involved in the drug scene," *id.* at 16, and who told him of "drug activity" at the house, *id.* at 17-18.

---

[3] The excerpts of the Detective Litsjo's deposition that Mr. Theoharis submitted are not paginated, but they comprise just eight pages.

ORDER – 5

**B.   Officers Enter the Harrison House; Officer Rongen and Detective Thompson Enter Mr. Theoharis's Bedroom.**

All four men, wearing clothing that plainly identified them as law enforcement officers, approached the Harrison House.  Detective Wheeler went to the back door, the other three men went to the front door.  Rongen Decl. ¶ 24.  They encountered Ashton and Cole Harrison at the front door, entered the house, and were immediately met by Nicholas and Shane Harrison, who were coming down the stairs.  *Id.* ¶¶ 25-26.  There is no dispute that Nicholas submitted to arrest without incident.  The officers told Detective Wheeler to join them from the rear of the house, and he did.  *Id.* ¶ 26.

Officer Rongen asked Shane where Nicholas Harrison was staying within the house.  Shane led Officer Rongen to an upstairs bedroom, where Officer Rongen began to search.  Rongen Decl. ¶ 27.  Detective Thompson quickly joined them.  *Id.*  Officer Rongen discovered what he contends was a "pay sheet detailing drug transactions."  *Id.* ¶ 28.  The "pay sheet" is not in the record.

It was then that Detective Thompson (or perhaps Officer Rongen) asked Shane Harrison if the same person who had been staying in the lower-level bedroom in October 2010 was still staying there.  Rongen Decl. ¶ 28; Triesch Decl., Ex. 2 (Thompson depo. at 62-63); Budge Decl., Ex. A (Rongen depo. at 137-38).  He replied that the previous roommate had left, and that now "Dustin" was "crashing" in that bedroom.  Triesch Decl., Ex. 2 (Thompson depo. at 62-63).  Officer Rongen's March 19, 2012, written statement ("March 2012 Statement") declares that it was he who initially asked Shane who was currently living in the lower-level bedroom, and that when he asked if the roommate was "there now," Shane replied that "he should be."  Budge Decl., Ex. 2 at 2.  In an August 2012 Sheriff's Office interview, Detective Thompson stated that "[f]rom the way Shane answered[,] I believed that someone was back there."  Triesch Decl., Ex. 2 (Aug. 2012 interview at 5).

Officer Rongen and Detective Thompson then descended from the upper level, passing Detective Litsjo and Detective Wheeler, who were both still detaining Nicholas,

ORDER – 6

Cole, and Ashton Harrison in the living room portion of the great room on the main floor. Budge Decl., Ex. C (Thompson depo. at 66). It is not clear from the record if Officer Rongen or Detective Thompson communicated with anyone on the main floor, but if they did, they neither asked about "Dustin" nor learned anything about him. *Id.* (Thompson depo. at 66, 69-71); Budge Decl., Ex. A (Rongen depo. at 156-60).

They descended the two-step staircase into the lower-level laundry room, which placed them about 5 horizontal feet from the main floor. Officer Rongen describes the room as "cluttered and mounded with clothing, boxes, bundles of insulation and numerous other items." Rongen Decl. ¶ 32 (describing laundry room and bedroom). Photos taken at vantages from the top of the staircase and at various points leading through the laundry room to the bedroom reveal that "cluttered" substantially understates the level of disarray in the laundry room. *Id.*, Exs. 7.8, 7.12-7.15. Furniture (including a table or desk in the center of the room), boxes (including at least one toolbox and at least one cooler), shoes, building materials, and many other obstacles were strewn throughout the room. *Id.* Anyone attempting to walk from the bottom of the staircase to the doors to Mr. Theoharis's bedroom would have had to walk at least 15 feet while carefully navigating the "clutter."

As the officers moved through the laundry room and approached the French doors to the bedroom, they saw that a sheet or other fabric hung from the bedroom side of the doors obscured the view through the glass panes of the doors. Rongen Decl. ¶ 31. They also noted the presence of a floor safe in the laundry room to the left of the French doors. *Id.* Officer Rongen now characterizes it as a "gun safe," *id.*, although he called it a "large standup safe" in his March 2012 Statement, Budge Decl., Ex. B at 2, and Detective Thompson was not certain, Triesch Decl., Ex. 2 (undated Thompson stmt.) (noting presence of "large floor safe, possibly a gun safe"). There is no evidence that the safe was open, and no evidence as to whether the officers had seen the safe in their October 2010 visit to the Harrison House. Both officers had their guns drawn as they approached

ORDER – 7

the French doors.  Rongen Decl. ¶ 30.  Officer Rongen knocked, announced his presence as a police officer (as did Detective Thompson), then opened the right-side French door and moved the fabric covering the glass.  *Id.* ¶ 31; Budge Decl., Ex. A (Rongen depo. at 174-75).  He discovered a bed that had not been in the room on his previous visit.  Mr. Theoharis was in the bed, lying under covers.  Rongen Decl. ¶¶ 32-33.  Officer Rongen entered the bedroom and Detective Thompson followed.  Budge Decl., Ex. A (Rongen depo. at 175), Ex. C (Thompson depo. at 69).

**C.  Officers Encounter Mr. Theoharis and Shoot Him.**

According to Mr. Theoharis, he was napping in his bedroom, oblivious to the officers' entry into the Harrison House and to Officer Rongen's and Detective Thompson's entry into his bedroom.  Theoharis Decl. ¶ 11.  Everyone agrees that the room was rather dark, although their accounts vary.  Rongen Decl. ¶ 32 ("The bar room was dark, with sheets and blankets covering the exterior windows."); Budge Decl., Ex. B (Rongen's Mar. 2012 stmt. at 2") ("The room was illuminated by one or two dim lights located above the bar," "had some natural light coming from the [exterior] door/windows," and "some natural light" penetrated "sheets" covering windows . . . ."); Theoharis Decl. ¶ 10 ("The curtains were drawn and the lights were off."); Triesch Decl., Ex. 2 (Thompson depo. at 88) (stating that bedroom was "pretty dark," necessitating flashlights), Ex. 6 (Theoharis depo. at 189) (describing window coverings).

Mr. Theoharis asserts that he woke up to "two people standing in [his] room and shining lights in [his] eyes."  Theoharis Decl. ¶ 11.  The lights were "on either end of [his] bed, to the left and right."  *Id.*  The lights kept him from seeing who was holding them, and he could see no weapons.  Triesch Decl., Ex. 6 (Theoharis depo. at 26, 31-32).  Officer Rongen was using a handheld flashlight.  Rongen Decl. ¶ 32.  Detective Thompson had a flashlight affixed to his sidearm, although there is some dispute about whether he initially pointed the sidearm at Mr. Theoharis or had it in a "low-ready" position.  Triesch Decl., Ex. 2 (Thompson depo. at 88-96).  Mr. Theoharis noticed that

ORDER – 8

the comforter he had been sleeping under was gone.  Theoharis Decl. ¶ 11; Triesch Decl., Ex. 6 (Theoharis depo. at 27).  A "normal speaking voice" from behind the flashlights asked him if he "had any ID."  Theoharis Decl. ¶¶ 11-12; Triesch Decl., Ex. 6 (Theoharis depo. at 30) ("I don't remember [the voice asking for my ID] being very loud.").  Mr. Theoharis responded "yeah, it's right here," and reached with his left hand to the floor on the left (west) side of his bed, where his wallet was.  Theoharis Decl. ¶ 11; Triesch Decl., Ex. 6 (Theoharis depo. at 32-34).  With his wallet in his hand, he turned back in the direction of the officers, who began shooting him.  *Id.*  They shot him "approximately 16 times . . . ."  Theoharis Decl. ¶ 11.

Consistent with Mr. Theoharis's assertion that he was asleep, he has no testimony regarding what happened before the officers woke him up.  The officers' vantage point from just inside the French doors was less than 10 feet almost directly south of the foot of Mr. Theoharis's bed, with the head of the bed abutting the north wall of the bedroom. Rongen Decl., Ex. 6 (scale diagram), Exs. 7.19 (photo from French doors toward bed), ¶¶ 64-73 (describing geographical orientation of photos).[4]  Immediately to the west of the head of the bed was a bedside table cluttered with beverage cans, among other things. Officer Rongen declares that he noticed hypodermic needles there, and called out "rigs" (a slang term for such needles) to Detective Thompson.  Rongen Decl. ¶ 33.  Detective Thompson recalls that Officer Rongen pointed out the "rigs" slightly later.  Budge Decl, Ex. C (Thompson depo. at 100-02).  Mr. Theoharis was lying on his right side, and thus facing the west side of the bed, toward the bedside table with the "rigs" on it.  Rongen Decl. ¶ 33.  Officer Rongen declares that he "stated 'Police, police, show your hands,'" *id.* ¶ 34, using a "very loud voice," Budge Decl., Ex. B (Mar. 2012 stmt. at 2).  The

---

[4] The doors from Mr. Theoharis's bedroom to the exterior of the Harrison house were also French doors, which can cause confusion when viewing the photos of the bedroom, particularly because the photos are taken with one of the exterior French doors open.  The court describes the scene with the understanding that the French doors through which the officers entered were on the south wall of the bedroom, the exterior French doors were on the east wall of the bedroom, and the head of the bed was against the north wall of the bedroom.  *See* n.2, *supra*.

ORDER – 9

officers contend that Mr. Theoharis "briefly moved his hands above the comforter to his wrists and then pulled them back underneath" the comforter.  Rongen Decl. ¶ 34; Triesch Decl., Ex. 2 (Thompson depo. at 90-91).  He appeared to Officer Rongen to be "lethargic and nonresponsive" and he suspected that he was "under the influence of a drug." Rongen Decl. ¶ 34.  Officer Rongen contends that both he and Detective Thompson "repeated commands that he show his hands," and that Mr. Theoharis said "No."  *Id.* Although Detective Thompson does not contend that he joined in the commands to Mr. Theoharis, he agrees that Mr. Theoharis at some point said "No" to the command to show his hands.  Triesch Decl., Ex. 2 (Thompson depo. at 90-91).  Officer Rongen yanked the comforter off of Mr. Theoharis.  Rongen Decl. ¶ 35; Triesch Decl., Ex. 2 (Thompson depo. at 93).  He could see no weapons.  Rongen Decl. ¶ 35.  Everyone agrees that Mr. Theoharis was clothed in a t-shirt and stocking cap.  Detective Thompson asserted that he was wearing blue jeans, which he found to be an odd choice of sleepwear.  Triesch Decl., Ex. 2 (Thompson depo. at 94, 124); Budge Decl., Ex. C (Thompson depo. at 126).  Mr. Theoharis says that he was wearing "gray cotton sweat pants."  Theoharis Decl. ¶ 10.

At this point, Officer Rongen's account of events begins to intersect with the previously-described account from Mr. Theoharis.  The two men agree that Officer Rongen asked Mr. Theoharis if he had identification.  Rongen Decl. ¶ 35; Theoharis Decl. ¶ 11 ("I heard a male voice ask me if I had any ID.").  Officer Rongen asserts that Mr. Theoharis responded "Ya," whereas Mr. Theoharis asserts that he said "yeah, it's right here," and then reached next to his bed where he had placed his wallet.  Rongen Decl. ¶ 35; Theoharis Decl. ¶ 11; Triesch Decl., Ex. 6 (Theoharis depo. at 32-34). According to Mr. Theoharis, he took his wallet in his hand and turned back in the direction of the officers.  Theoharis Decl. ¶ 11.  That is when, according to Mr. Theoharis, the officers began shooting.  *Id.*  Because he had already turned fully in the direction of the officers, he asserts that all of the "approximately 16" shots that the officers hit him with struck him from the front of his face, arms, legs and abdomen.  *Id.*

ORDER – 10

But according to Officer Rongen, Mr. Theoharis made no motion to the side of the bed in response to his question about identification.  That motion came later, when Officer Rongen asked if he had any weapons.  In Officer Rongen's account, Mr. Theoharis responded "I have three guns."  Rongen Decl. ¶ 36.  When Officer Rongen asked "Where?" Mr. Theoharis "forcefully responded 'right here!'" and "quickly rolled to the left [west side] of the bed and swept the floor with his left hand."  *Id.*  Officer Rongen began yelling "Show your fucking hands!"  *Id.*  Officer Rongen could see that Mr. Theoharis's left hand was empty after he swept the floor, but he then "quickly inserted his left hand between the mattress and box springs and rotated his forearm as if he were grabbing and pulling something."  Rongen Decl. ¶¶ 36-37.  Officer Rongen asserts that he "feared that he had armed himself with one of the guns he claimed to have and that he was preparing to shoot," so he "fired [his] gun at [Mr. Theoharis] as he rolled to his left."  Rongen Decl. ¶ 37.  The same account appears in his March 2012 Statement, except that he notes that he "fired his gun while [Mr. Theoharis's] back was exposed to [him]."  Budge Decl., Ex. B (Mar. 2012 stmt. at 3).

Detective Thompson's account of what immediately preceded the shooting differs somewhat from both Mr. Theoharis's account and Officer Rongen's.  He states that Officer Rongen never asked for identification.  Budge Decl., Ex. C (Thompson depo. at 127-28).  Officer Rongen asked if Mr. Theoharis had weapons, Mr. Theoharis responded that he "had three guns," and Officer Rongen asked where the guns were.  Triesch Decl., Ex. 2 (Thompson depo. at 102-03, 201).  Mr. Theoharis loudly said "right here," then "dove his left hand across his body . . . and over the side of the bed as if grabbing for something."  *Id.* (Thompson depo. at 103-04).  There is evidence that at some point, Officer Rongen moved to the left of Detective Thompson.  Budge Decl., Ex. A (Rongen depo. at 211).  That perhaps explains why Officer Rongen could see Mr. Theoharis's hand as it reached over the left (west) edge of the bed and toward the floor, whereas Detective Thompson could not.  Detective Thompson began "yelling loudly" for Mr.

ORDER – 11

Theoharis to put up his hands, and Detective Thompson recalls that Officer Rongen was yelling similar commands.  Triesch Decl., Ex. 2 (Thompson depo. at 104-05).  Fearing that Mr. Theoharis was reaching for a gun, Detective Thompson began shooting when Mr. Theoharis's hand was still out of sight over the edge of the bed, and he did not stop shooting until Mr. Theoharis had rolled back onto his back.  *Id.* (Thompson depo. at 105, 115-16, 202-03).  An undated post-shooting statement from Detective Thompson contains essentially the same account.  Triesch Decl., Ex. 2.

Mr. Theoharis denies that anyone asked him if he had weapons, denies that he said he had weapons, denies that either officer asked him any question other than the question about his identification, and denies that the officers ever raised their voices.  Theoharis Decl. ¶ 12.  He also denies that he reached between his mattress and box spring.  *Id.* ¶ 13.

The Harrisons and the officers who remained on the main floor could see nothing of the encounter with Mr. Theoharis, but they have various accounts of what they heard.  They agree that no more than 30 seconds passed between when Officer Rongen and Detective Thompson descended the stairs and when the shooting began.  Budge Decl., Ex. F (C. Harrison depo. at 25) (estimating that shots came "within seconds"),  Ex. H (N. Harrison depo. at 16) (estimating 5 to 10 seconds); Triesch Decl., Ex. 3 (Wheeler depo. at 37-38) (estimating 10 to 30 seconds).  Officer Rongen estimates that 60 to 90 seconds passed from his descent to the lower level and his decision to shoot Mr. Theoharis.  Budge Decl., Ex. A (Rongen depo. at 198).  The men on the main floor agree that they heard nothing from any of the three men in the lower level before the shooting began.  Budge Decl., Ex. D (Wheeler depo.),[5] Ex. F (C. Harrison depo. at 25), Ex. H (N. Harrison depo. at 16-17).  Cole Harrison testified that from the main floor of the house, he can "hear [his] grandson if he just talks down there."  Budge Decl., Ex. F (C. Harrison depo. at 25).  Nicholas Harrison testified that he would have been able to hear the men below if

---

[5] As was the case with Detective Litsjo's deposition, the excerpts of Detective Wheeler's deposition that Mr. Theoharis submitted are not paginated.  The excerpts comprise just ten pages.

ORDER – 12

they had been talking.  Budge Decl., Ex. H (N. Harrison depo. at 17).  Robert Thornton, a witness who Mr. Theoharis hired, states that he stood on the main floor and listened to others in the lower-level bedroom talking in a "normal conversational tone" and could hear their words.  Thornton Decl. (Dkt. # 65), Ex. A (report at 10).  Dr. Daniel Bruck conducted an acoustical analysis on Mr. Theoharis's behalf to "identify the audibility and intelligibility of speech between the lower floor bedroom and the main living room" and concluded that "shouting speech" from the bedroom would be "clearly audible and intelligible" from the living room.  Bruck Decl. (Dkt. # 66), Ex. A (report at 1).

The court now considers the parties' summary judgment motions in light of this evidence.

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

Section 1983 provides a remedy for a plaintiff who proves that a defendant acting under color of state law violated her constitutional rights.  There is no dispute that Officer Rongen was acting under color of state law at the Harrison House, but he disputes that he violated Mr. Theoharis's constitutional rights, and he also invokes qualified immunity,

ORDER – 13

which protects a § 1983 defendant "from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A defendant successfully invokes qualified immunity either by showing that a plaintiff has not alleged (or provided evidence for, depending on the stage of litigation) facts amounting to a violation of a constitutional right or that the right was not "clearly established" at the time of the defendant's violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court has discretion to consider either portion of the qualified immunity test first. *Id.* at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001)).

A.     **No Clearly Established Law Prohibited Officer Rongen's Entry into Mr. Theoharis's Bedroom.**

Although much of Officer Rongen's and his colleagues' conduct falls within the scope of the Fourth Amendment, most of it is not at issue in this case. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV. The officers' entry into the Harrison House, their arrest of Nicholas Harrison, their detention of the other members of the Harrison family, and their search of the upstairs bedroom all implicate the Fourth Amendment. Mr. Theoharis challenges none of that conduct. He disavows any claim based on the officers' entry in the Harrison House or the arrest, and he "does not challenge any search of any other areas" of the Harrison House. Pltf.'s Mot. (Dkt. # 69) at 1. His sole claim not based on an allegation of excessive force is that Officer Rongen violated the Fourth Amendment by entering his bedroom. *Id.*

1.     **The Fourth Amendment Protected Mr. Theoharis's Reasonable Expectation of Privacy in His Bedroom.**

Even construing the evidence in the light most favorable to Officer Rongen, a reasonable officer who knew what he knew would have concluded that the Fourth Amendment protected Mr. Theoharis's privacy in his bedroom. A person can acquire a

ORDER – 14

reasonable expectation of privacy in an area within another person's property, whether that area is a separate living unit or merely a guest room in a single-family home. *United States v. Cannon*, 264 F.3d 875, 879 (9th Cir. 2001). Even overnight guests in another's home acquire privacy rights that the Fourth Amendment protects. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990).

Mr. Theoharis bears the burden to prove both that he had an expectation of privacy in his bedroom and that his expectation was objectively reasonable, *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001); he has discharged that burden here as a matter of law and undisputed fact. No one disputes that Mr. Theoharis expected privacy in his bedroom, and the court discerns no material dispute that his expectation of privacy was objectively reasonable. The officers knew from their October 2010 visit that the lower-level bedroom was a living space for a third party, and the only new information they acquired in February 2012 was that a new third party, "Dustin," was using that living space.

Officer Rongen's evidence that others could access Mr. Theoharis's room does not undermine his reasonable expectation of privacy. For example, Shane Harrison had escorted the officers into the room in October 2010, demonstrating that he had access at least at that time. In addition, Officer Rongen states that as he prepared to enter in 2012, he noticed a lock on the outside of the interior French doors leading to Mr. Theoharis's bedroom, suggesting that other occupants could access the room. Rongen Decl. ¶ 31. But evidence that other occupants could access the room is scarcely relevant in assessing Mr. Rongen's expectation of privacy. As the court has noted, even an overnight guest gains the protections of the Fourth Amendment in the room where she sleeps, protections that do not require the guest to bar the door to exclude her host. *Olson*, 495 U.S. 91, 99 ("That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy."). Even if a reasonable officer in Officer Rongen's position would have believed that members of the Harrison family had

ORDER – 15

physical access to the lower-level bedroom, that would not change the fact that any reasonable officer in his position would have known that it was Mr. Theoharis's room, a space in which he had a reasonable expectation of privacy. The court concludes that any reasonable officer who knew what Officer Rongen and Detective Thompson knew would have concluded as a matter of clearly established law that the lower-level bedroom was a place where a third party had a reasonable expectation of privacy.

A "search of a guest room in a single family home which is rented or used by a third party, . . . to the extent that the third party acquires a reasonable expectation of privacy, requires a warrant." *Cannon*, 264 F.3d at 879. No one disputes that the officers had no warrant to enter Mr. Theoharis's bedroom. In a civil suit like this one, that means that Officer Rongen bears the burden of producing evidence that an exception to the warrant requirement applies, although the ultimate burden of proof remains with Mr. Theoharis. *Larez v. Holcomb*, 16 F.3d 1513, 1517 (9th Cir. 1994). The exception to the warrant requirement to which Officer Rongen points is that his entry into Mr. Theoharis's bedroom was a lawful "protective sweep." The court now considers that contention, keeping in mind that it must "evaluate the reasonableness of a warrantless entry," like most exercises of police power that the Fourth Amendment regulates, "in view of the totality of the circumstances from the perspective of the police officers at the time of the entry." *Murdock v. Stout*, 54 F.3d 1437, 1441 (9th Cir. 1995); *see also Ryburn v. Huff*, 132 S. Ct. 987, 991-92 (2012).

> ### 2. Despite Mr. Theoharis's Reasonable Expectation of Privacy, No Clearly Established Law Prohibited Officer Rongen from Entering His Bedroom to Perform a "Protective Sweep."

The Fourth Amendment permits some intrusions into areas of a home despite a person's reasonable expectation of privacy in those areas. Among the permissible intrusions is the "protective sweep." The prototypically permissible protective sweep is one of the two types the Supreme Court authorized in *Maryland v. Buie*, 494 U.S. 325 (1990).

ORDER – 16

The *Buie* Court considered the execution of an arrest warrant of a suspected felon inside his home. *Id.* at 328. Once officers entered the home, the suspect emerged from his basement and officers arrested him. *Id.* Immediately thereafter, an officer entered the basement to determine if there was anyone else present, discovering clothing in plain view that matched the description of the suspect at the scene of the crime. *Id.* Balancing the suspect's reasonable expectation of privacy in his home against the risk to officer safety from unknown persons in the home, *id.* at 331-33, the Court held that two species of protective sweeps did not violate the Fourth Amendment. First, the Court held that "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched." *Id.* at 334. Second, it held that beyond those immediate spaces, an officer could not conduct a protective sweep absent "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

### a.   Officer Rongen's Entry into Mr. Theoharis's Bedroom Was Not a "Protective Sweep" Within the Meaning of *Buie*.

*Buie* itself is of no assistance to Officer Rongen. Mr. Theoharis's bedroom was not a place "immediately adjoining the place of [Nicholas Harrison's] arrest from which an attack could immediately be launched." Officer Rongen argues otherwise, pointing to authority construing spaces a short distance from the place of arrest as immediately-adjoining areas. *See United States v. Lemus*, 582 F.3d 958, 963-64 (9th Cir. 2009) (noting, for example, that a "bedroom fifteen feet down a hallway in which the suspect was arrested" could be an immediately-adjoining space). But in this case, Officer Rongen's photographs and scale diagram demonstrate conclusively that the bedroom was not a space immediately adjoining the place of arrest. The court agrees with Officer

ORDER – 17

Rongen's assessment that Mr. Theoharis's bedroom was about 20 feet from the main floor room where officers had arrested Nicholas Harrison.  Def.'s Opp'n (Dkt. # 73) at 13.  But distance is in this instance is not as important as other considerations.  First, there was no line of sight from the lower-level bedroom to the upper floor, meaning that even an attack with a firearm could not have been launched from the bedroom itself.  Second, even if the Harrison House had been empty, the passage from the lower-level bedroom to the main floor required passage through a closed door covered by a sheet or other fabric, through a laundry room, through another doorway, and up a short staircase.  Those facts, by themselves, are likely enough to place the lower-level bedroom beyond the immediate area from which an attack could be launched.  Those facts do not stand by themselves in this case, because even a cursory visual inspection would have revealed that the furniture, boxes, building materials, clothing, and other obstacles in the laundry room would have made any attack launched from the lower-level bedroom a slow and noisy one.  Even if officers could not have ascertained the extent of the clutter in the laundry room from the main floor, they would have discovered it the moment they reached the entryway at the bottom of the stairs.  As a matter of law and undisputed fact, no reasonable officer could conclude that a person in Mr. Theoharis's room could launch an immediate attack on the officers on the main floor.

Officer Rongen contends that a reasonably prudent officer could have believed that whoever was living in Mr. Theoharis's room posed a danger to officers, thus justifying a sweep of his room even though it is not an area immediately adjoining the site of Nicholas Harrison's arrest.  Even construing the facts in the light most favorable to Officer Rongen, he is mistaken as a matter of law.  At the time he learned that "Dustin" was in the lower-level bedroom, Officer Rongen knew nothing about him other than that he was "crashing" at the Harrison House and that, so far, he had done nothing to indicate his presence to officers.  Officer Rongen attempts to manufacture reasonable suspicion of Mr. Theoharis by pointing to his knowledge of the Harrison House as a "problem house"

ORDER – 18

or "drug house," but that takes him nowhere.  Officer Rongen had no knowledge of anyone at the Harrison House, much less Mr. Theoharis, posing a danger to anyone.  That the Harrison House had been the site of drug activity makes no difference.  The *Buie* Court observed that "even in high crime areas, where the possibility that any given individual is armed is significant," a "protective sweep of a house" requires "reasonable, individualized suspicion . . . ."  494 U.S. at 334 n.2.  Officer Rongen cannot satisfy the strictures of *Buie* by labeling the Harrison House a "problem house."

Officer Rongen also points, in his effort to establish reasonable suspicion that the occupant of the lower-level bedroom posed a threat to officers, to amorphous evidence that the previous occupant of Mr. Theoharis's bedroom had weapons.  That evidence is meaningless in assessing the threat Officer Rongen faced in 2012.  Officer Rongen knew that the previous occupant was gone, so even if he had reason to suspect that the previous occupant had weapons, he had no reason to suspect the new occupant.

Even if the court ignores conflicting evidence and assumes that Officer Rongen believed the safe in the laundry room was a "gun safe," his observation is of little value in a reasonable suspicion analysis.  There is no evidence that a reasonable officer would have suspected that the occupant of the lower-level bedroom had a weapon from the safe.

Also unavailing is Officer Rongen's reliance on evidence that allegedly demonstrates that Nicholas Harrison posed a danger to officers.  As the court has noted, the record is not clear either as to what Officer Rongen knew about Nicholas's criminal history or as to whether that criminal history would have given an officer reason to fear for his safety.  Even assuming that Officer Rongen reasonably believed Nicholas to be a threat, he was in handcuffs and under the supervision of two armed officers when Officer Rongen decided to enter Mr. Theoharis's room.  Whatever reason Nicholas's criminal history gave Officer Rongen to fear him, it gave him no reason to suspect a threat from a third party who lived in the same home.

ORDER – 19

For all of these reasons, the court rules as a matter of law that a reasonable officer who knew what Officer Rongen knew could not formulate a reasonable suspicion that the person in the lower-level bedroom posed a threat to officers, and thus could not conduct the second type of protective sweep that the *Buie* Court authorized.  Generalized suspicion about the occupants of the Harrison House because of its reputation as a "problem house" or "drug house," knowledge that a new occupant was in the lower-level bedroom, fear of Nicholas Harrison based on his criminal history, and knowledge of the "gun safe" do not add up to reasonable suspicion of a threat to the officers.

   **b.**  **Officer Rongen's Entry into Mr. Theoharis's Bedroom Was At Least Arguably A Protective Sweep Within the Scope of Decisions That Have Extended *Buie*.**

Although Officer Rongen cannot justify his entry into Mr. Theoharis's bedroom as a sweep within the scope of *Buie*, he also contends that it was a sweep authorized by precedent extending *Buie*.  Other courts, including at least one Ninth Circuit panel, have extended *Buie*'s reasoning to authorize protective sweeps in circumstances other than the aftermath of an in-home warranted arrest.  For example, in *United States v. Miller*, 430 F.3d 93, 94 (2d Cir. 2005), the court held that an officer in a home to execute any "lawful process," could conduct a protective sweep.  The *Miller* court, which considered officers in a home to serve a protective order, observed that it was not the first to extend *Buie* beyond the context of an arrest with a warrant.  430 F.3d at 99 ("Several of our sister circuits have refused to confine the protective sweep doctrine to contexts in which officers execute arrest warrants.").  It observed that the First, Fifth, Sixth, Seventh, Ninth and District of Columbia Circuits had condoned protective sweeps in different contexts, whereas only the Tenth Circuit had required an arrest to justify a protective sweep.  *Id.*

Officer Rongen contends that he can benefit from these extensions of *Buie* because he had lawful authority by virtue of Nicholas Harrison's status as a probationer to search the lower-level laundry room, and thus authority to conduct a suspicionless protective sweep of Mr. Theoharis's bedroom, which immediately adjoins the laundry room.

ORDER – 20

Before considering that contention, the court emphasizes its limits for purposes of today's decision. As noted, Mr. Theoharis does not challenge Officer Rongen's authority to search any area of the Harrison House *except* his bedroom. Officer Rongen asserts that he could justify his entry into Mr. Theoharis's bedroom by virtue of his authority to conduct a "DOC search," which the court takes to mean a search justified solely by his authority to search the premises of a probationer under DOC supervision. Def.'s Reply (Dkt. # 71) at 2. But Officer Rongen disavows that justification in the same sentence, contending that the "legality of such a search is not now before the court." *Id.* The court thus assumes without deciding *only* that Officer Rongen had authority to search the laundry room, then considers whether that authority permitted him to conduct a suspicionless protective sweep of Mr. Theoharis's bedroom.

Even if the law permits a suspicionless protective sweep of areas immediately adjoining a room being searched, Officer Rongen does not benefit from that law. The court observes, as does Mr. Theoharis, that courts who have extended *Buie* to contexts other than the aftermath of an arrest have extended only that portion of *Buie* that authorizes a protective sweep based on a reasonable suspicion of a threat to officer safety. *See United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005) ("Other circuits have applied *Buie* to non-arrest situations but only under the second prong of *Buie*, which requires a showing of a reasonable suspicion of dangerous individuals in the house."). Even if clearly-established law does not prohibit a suspicionless sweep of adjoining areas as an incident of a search, there is no evidence that Officer Rongen was actually searching the laundry room or intended to do so. All evidence is that he and Detective Thompson were in the laundry room for one purpose – to pass through it on their way to Mr. Theoharis's bedroom. Where the Fourth Amendment allows a search or seizure as an incident of a first search or seizure, it requires that the officer actually conduct that first search or seizure. For example, well-established law permits an officer to conduct a search of a person as an incident to his lawful arrest. In *Knowles v. Iowa*, however, the

ORDER – 21

Supreme Court concluded that where an officer could have arrested a suspect, but chose instead to cite him for an infraction, the officer had no authority to search the suspect. 525 U.S. 113, 115-16 (1998).  By the same token, even if the law permits a suspicionless protective sweep of areas immediately adjoining a room to be searched, it requires an actual search or an intent to conduct one.  There is no evidence that Officer Rongen or any other officer intended to search the laundry room.

The court's conclusion that Officer Rongen cannot face liability for damages for his entry into Mr. Theoharis's bedroom is based on a Ninth Circuit opinion interpreting *Buie* broadly: *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993).  In *Garcia*, police observed two people engaging in conduct consistent with drug trafficking through the front door of an apartment, then gained consent to enter.  *Id.* at 1276-77, 1282.  They detained one of the men, asking him if there were others in the apartment.  *Id.* at 1277, 1282.  He said that there were others, and the officers conducted a sweep of the apartment (including a level above the level on which the officers entered), finding drugs and a gun. *Id.*  The court declined to suppress that evidence, noting that the "officers needed to find out for their own safety whether other people were in the apartment."  *Id.* at 1282.  The court cited *Buie*, but offered no discussion of its application to the facts before it.

*Garcia* stands out because the sole facts justifying a protective sweep of *an entire apartment* were the officers' knowledge that other people were in the apartment and their reasonable suspicion of drug trafficking.  The officers did not confine their sweep to areas immediately adjoining the area where they detained the man, and there is no indication that officers had any individualized reason to suspect that the people in the apartment posed a danger to officers.  Indeed, it is easy to read *Garcia* as standing for the proposition that mere knowledge that others are in a home where officers are lawfully present is sufficient reason to sweep the home to find them.  For reasons the court has discussed, that proposition seems inconsistent with *Buie*, but the court is bound by *Garcia* nonetheless.

ORDER – 22

Officer Rongen knew at least as much as the officers in *Garcia*.  He had a reasonable suspicion that drug-related activity was afoot in the Harrison House, and he had knowledge that a person was present in the lower-level bedroom.  Although *Garcia* appears to authorize a protective sweep of that bedroom in these circumstances, it suffices to hold that in light of *Garcia*, no clearly-established law prohibited a protective sweep in these circumstances.  The parties cite a wealth of out-of-circuit and district court authority addressing these issues, much of which is contrary to Officer Rongen's position.  What is missing, however, is any authority or argument that would allow the court to look past *Garcia* or interpret it consistently with Mr. Theoharis's position.  To determine what law is clearly established, the court must look first to Supreme Court and Ninth Circuit authority, turning to other precedent only where binding precedent is lacking.  *Community House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010).

There is, to be sure, Ninth Circuit precedent taking a less expansive view of *Buie* than the *Garcia* panel.  In *United States v. Reid*, 226 F.3d 1020, 1023 (9th Cir. 2000), a panel considered a search of the apartment after police apprehended a man fleeing through its rear door after he saw other officers at the front door.  Police entered the apartment and found evidence of marijuana trafficking.  *Id.*  After the court concluded that the officers had no consent to enter, it considered the officers' attempt to "salvage" the entry by characterizing it as a protective sweep.  *Id.* at 1027.  Noting that *Buie* authorized a protective sweep "as an incident to the arrest," the court held that because the man the police had apprehended was not under arrest, and because there was no reason to believe that anyone posing a threat to the officers was in the apartment, a protective sweep was not permissible.  *Id.* at 1027 (quoting *Buie*, 494 U.S. at 334 (emphasis in *Reid*)).  But even if *Reid* squarely forecloses Officer Rongen's conduct,[6] it

---

[6] Mr. Theoharis also cites an unpublished memorandum disposition from a 1993 Ninth Circuit panel that concludes that the mere presence of other adults during an in-home arrest is an insufficient justification for a protective sweep.  Because Ninth Circuit rules prohibit the citation of unpublished dispositions issued before 2007 except in narrow circumstances that do not apply here, the court declines to repeat Mr. Theoharis's citation.  Ninth Cir. R. 36-3.

ORDER – 23

does not overrule *Garcia*.  Because *Garcia* is binding authority that at least arguably permits the officers' entry into Mr. Theoharis's bedroom, Officer Rongen is entitled to qualified immunity.

### 3.   The Court Declines to Determine Whether Other Exceptions to the Warrant Requirement Justified Entry into Mr. Theoharis's Room.

The court has already concluded that Officer Rongen needed either a warrant or an exception to the warrant requirement to enter Mr. Theoharis's bedroom, and explained that the only exception on which Officer Rongen relies is his alleged authorization to conduct a protective sweep of that bedroom.  Because clearly-established law did not prohibit Officer Rongen's sweep of the bedroom, and because of Officer Rongen's disavowal of other justifications, the court need not resolve Officer Rongen's intimations that he had other justifications for entering the bedroom.

But, although there appears to be no dispute for the court to resolve as to other justifications for Officer Rongen's entry into the bedroom, no one should infer from this order that the court has placed its imprimatur on those justifications, particularly on Officer Rongen's views of the lawful scope of a search of premises where a probationer[7] lives.  Those views raise serious questions.  They include an assertion that Officer Rongen "had the authority to conduct a DOC search of [Mr. Theoharis's bedroom]," despite Mr. Theoharis's reasonable expectation of privacy," Def.'s Reply (Dkt. # 71) at 2, and the assertion that the "authority to search an offender's residence extends to the entire residence," even areas in which others have an expectation of privacy, Def.'s Mot. (Dkt. # 56) at 16.  The sole authority Officer Rongen cites for those assertions is *State v.*

---

[7] Officer Rongen refers to Nicholas Harrison's community custody as both parole and probation. *E.g.*, Def.'s Mot. (Dkt. # 57) at 14-16.  "[P]arolees have fewer expectations of privacy than probationers," and Fourth Amendment case law reflects that distinction. *Samson v. California*, 547 U.S. 843, 850 (2006).  The only evidence as to Nicholas's status in February 2012 is his community custody agreement.  Washington's definition of "community custody" at RCW 9.94A.030(5) encompasses circumstances consistent with probation and circumstances consistent with parole. *United States v. Franklin*, 603 F.3d 652, 654 n.1 (9th Cir. 2010).  Because the court ultimately grants Officer Rongen's motion for summary judgment as to the unlawful entry claim, the court assumes, in Mr. Theoharis's favor, that Nicholas was a probationer in February 2012.

ORDER – 24

*Winterstein*, 220 P.3d 1226 (Wash. 2009), which does not support his view. *Winterstein* confirmed the principle that a DOC officer exercising authority to enter a probationer's residence must have probable cause to believe that the residence he enters is actually the probationer's. *Id.* at 1230. The court had no occasion to consider an officer's entry into a third party's room at a probationer's residence. This court expects that the *Winterstein* court, which coincidentally considered the lawfulness of Officer Rongen's conduct, would have taken a dim view of Officer Rongen's assertions that third parties living with probationers surrender Fourth Amendment protection in their own rooms. *See id.* at 1230 ("Even though probationers have a lessened expectation of privacy, third parties not under the control of the DOC do not."). Mr. Theoharis contends that the decision in *State v. McKague*, 178 P.3d 1035 (Wash. Ct. App. 2008) as well as an unpublished Washington appellate decision clearly establish that Mr. Theoharis's privacy interests were not diminished because he lived with a probationer. State court interpretations of the Fourth Amendment do not bind a federal court, *Watson v. Estelle*, 886 F.2d 1093, 1095 (9th Cir. 1989), *United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991), to say nothing of the binding effect of unpublished decisions whose citation the issuing court has barred in Wash. GR 14.1(a). The court need not decide which party has the better view of Washington authority, nor need it explore federal authority on this issue, particularly where Officer Rongen has disavowed any justification of his entry into Mr. Theoharis's bedroom as a "DOC search." Def.'s Reply (Dkt. # 71) at 2; *see also Davis*, 932 F.2d at 759 (authorizing search of safe where police had reasonable suspicion that it was "jointly owned, possessed, or controlled" by the defendant and a probationer).

Also debatable is Officer Rongen's assertion that any violation of Nicholas Harrison's probation conditions gave him authority to search the Harrison House. He correctly asserts that conditions of probation that make a probationer and his property subject to suspicionless search are lawful in some circumstances. *United States v. King*, 736 F.3d 805, 806 (9th Cir. 2013) (upholding suspicionless search for violent probationer

ORDER – 25

1    where probation conditions authorized it); *see also United States v. Knights*, 534 U.S.

2    112, 114, 122 (2001) (authorizing search of probationer based on reasonable suspicion

3    where probation conditions authorized suspicionless search).  But the law is unclear as to

4    whether a suspicionless search is permissible absent conditions of probation that permit

5    it.  *King*, 736 F.3d at 810 ("We need not decide whether the Fourth Amendment permits

6    suspicionless searches of probationers who have not accepted a suspicionless-search

7    condition, or of lower level offenders who have accepted a suspicionless-search

8    condition . . . .").

9          In this case, Nicholas Harrison's probation conditions do not subject him to

10   suspicionless search, they "subject [him] to search and seizure of [his] person, residence,

11   automobile, or other personal property" on "reasonable cause . . . to believe that [he] had

12   violated the conditions/requirements or instructions" contained in those conditions.

13   Rongen Decl., Ex. 3 at 3.  Officer Rongen likely had at least reasonable suspicion that he

14   would find evidence of violations of the drug-related conditions of Nicholas's probation

15   agreement if he searched the Harrison House.  More questionable is his broader assertion

16   that reasonable suspicion that Nicholas had violated his probation by failing to report to

17   the DOC justified a search of all common areas of the Harrison House.  Washington

18   officials have taken the same position – that suspicion of a probation violation justifies a

19   search of the probationer's person, residence, or personal property, "regardless of

20   whether the search might yield evidence related to the violation[]."  *State v. Jardinez*, 338

21   P.3d 292, 295 (Wash. Ct. App. 2014) ("In essence, the State argues that any parole

22   violation justifies any search for any other violation.").  But the language of the search

23   condition of Nicholas's agreement (and the language of RCW 9.94A.631(1), which

24   appears to be the source of that condition) is susceptible to an interpretation that limits

25   the scope of the search to what might reasonably yield evidence of the violation that

26   instigated the search.  *Id.*  The *Jardinez* court adopted that more restrictive view of the

27   scope of the DOC's search authority.  *Id.* at 297-98.

28   ORDER – 26

1       At this time, no decision is necessary as to whether Nicholas Harrison's status as a

2   probationer justified Officer Rongen's entry into Mr. Theoharis's bedroom.   The court

3   now turns to Mr. Theoharis's excessive force claim, where a decision is necessary.

4   **B.   Disputed Facts Prevent the Court from Entering Summary Judgment in**
        **Officer Rongen's Favor as to Mr. Theoharis's Excessive Force Claim.**
5
6       Officer Rongen's decision to shoot Mr. Theoharis was a seizure within the

7   meaning of the Fourth Amendment,[8] which governs both the lawfulness of a seizure and

8   the means used to accomplish it.   *See Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).   The

9   relevant inquiry is whether Officer Rongen's actions were reasonable, balancing Mr.

10  Theoharis's Fourth Amendment interests against the government interests alleged to

11  justify the shooting.   *Id.*   Reasonableness is evaluated objectively, by asking whether a

12  reasonable officer confronted with the same circumstances would have believed the

13  shooting reasonable.   *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The

14  'reasonableness' of a particular use of force must be judged from the perspective of a

15  reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

16      The court balances law enforcement interests against the individual's to determine

17  whether a use of force was reasonable.   *Espinosa v. City & County of San Francisco*, 598

18  F.3d 528, 537 (9th Cir. 2010).   It evaluates the "severity of the intrusion" by determining

19  the degree of force used.   *Id.*   It then assesses the government's interest by considering

20  "(1) the severity of the crime; (2) whether the suspect posed an immediate threat to the

21  officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting

22  to escape."   *Id.* (summarizing factors from *Graham*, 490 U.S. at 396).   These factors are

23  not exclusive, and the court may consider any factor relevant to the reasonableness

24  inquiry.   *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) ("Other relevant

25  factors include the availability of less intrusive alternatives to the force employed,

26
27  [8] In a footnote in his opposition to Officer Rongen's motion, Mr. Theoharis asserts that Officer
    Rongen's decision to brandish his weapon in the first place was excessive force.   Pltf.'s Opp'n
    (Dkt. # 63) at 20 n.6.   Because Officer Rongen did not address this assertion, the court will not.
28  ORDER – 27

whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."). For example, the court may consider the plaintiff's culpability in creating the circumstances that led to the use of force. *Scott v. Harris*, 550 U.S. 372, 384 (2007).

In this case, the summary judgment standard is fatal both to Officer Rongen's assertion that he did not violate the law when he shot Mr. Theoharis and to his claim for qualified immunity. Evidence supports Mr. Theoharis's version of events, in which he was awakened abruptly, responded to a single question asking him if he had identification, and was shot as he tried to present that identification to the officer who asked him for it. Considering that version, along with all of the circumstances known to the officers before they confronted Mr. Theoharis, the shooting was plainly an exercise of excessive force. In that version, Officer Rongen confronted a man who had committed no crime more serious than drug use. The man was asleep when officers confronted him. The man complied with officers' commands even though he did not know who they were and they should have known he could not see them beyond the flashlights they were shining in his eyes. The man posed no threat to officers based on what they knew before they entered his bedroom, for reasons the court already discussed in Part III.A.2.a when dismissing Officer Rongen's assertion that he had reasonable suspicion that the occupant of the bedroom posed a threat to officers. The man did nothing in the bedroom to indicate that he posed a threat. Officer Rongen shot him nonetheless. Officer Rongen presents evidence that both he and Detective Thompson believed that they faced a threat of deadly force. The court cannot credit that evidence on summary judgment, where other evidence permits the conclusion that they did not believe they were in danger. Putting that aside, the Fourth Amendment does not authorize the use of deadly force whenever an officer sincerely believes that he faces harm; it demands that the officer's belief be objectively reasonable. *Price v. Sery*, 513 F.3d 962, 967 (9th Cir. 2008); *see also Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth

ORDER – 28

1    Amendment violation out of an objectively reasonable use of force; nor will an officer's

2    good intentions make an objectively unreasonable use of force constitutional."). By Mr.

3    Theoharis's account of events, Officer Rongen's decision to shoot was not objectively

4    reasonable.

5            This might be a closer case if the officers claimed that they had mistaken Mr.

6    Theoharis's wallet for a weapon, but they do not. Their version of events (which the

7    evidence also supports, but which Mr. Theoharis's evidence squarely contradicts) is that

8    they shot not because they saw what they believed to be a weapon, but because they

9    believed that he was reaching for a firearm in light of Mr. Theoharis's assertions that he

10   had "three guns," that they were "right here," and his sudden reach to the side of the bed.

11   A jury who believes Mr. Theoharis's version of events could find (indeed, it might be

12   compelled to find) that officers used excessive force. The officers cite no law that

13   suggests that the Fourth Amendment permitted the shooting given Mr. Theoharis's

14   version of events, and the court is aware of none.[9] Only in an "obvious case" do the

15   generalized use-of-force standards announced in *Graham* and *Garner* serve as clearly

16   established law. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Mr. Theoharis's

_____

17   [9] Officer Rongen cites two cases from this District granting qualified immunity to officers facing
18   excessive force claims. Both were decided after the shooting in this case, and both are
     distinguishable. In *Estate of Slater v. King County*, No. C12-1132MJP, 2013 U.S. Dist. LEXIS
19   114369, at *3 (W.D. Wash. Aug. 13, 2013), the court considered officers pursuing a man who
     had just bloodied his wife's face. The first officer on the scene told a later-arriving officer that
20   the suspect was holding a knife. *Id.* at *5-6. The later-arriving officer shot the man as he
     approached him, and there was a dispute as to whether the officer was aware that the man was no
21   longer carrying the knife. *Id.* at *11-12. The court disagrees with Officer Rongen's contention
     that he faced comparable circumstances. He faced a man who had not just committed a violent
22   crime and who was not known to be in possession of a deadly weapon. In *McDonald v. City of
     Tacoma*, No. C11-5774RBL, 2013 U.S. Dist. LEXIS 47808, at *1 (W.D. Wash. Apr. 2, 2013), an
23   officer confronted a man suspected of shooting his girlfriend days earlier. It was undisputed that
     instead of complying with police commands to go to the ground, the suspect stood with his arms
24   outstretched and holding a black wallet. *Id.* at *4-5, 11. Believing the wallet to be a gun, the
     officer shot. *Id.* at *4, *11. As the court has noted, Officer Rongen does not claim he saw a
25   wallet and believed it to be a gun, he claims that he believed Mr. Theoharis was reaching for a
     gun. A jury who believed Mr. Theoharis's testimony (bolstered by the testimony of the men
26   upstairs) could conclude that Officer Rongen never ordered Mr. Theoharis to show his hands, but
     only asked him for identification. A jury who believed Mr. Theoharis's testimony that he was
27   complying with that question could conclude that no reasonable officer would have believed Mr.
     Theoharis posed a threat.

28   ORDER – 29

account of events, however, presents an obvious case.  In that version of events, Officer

Rongen violated clearly-established law prohibiting the excessive use of force.  *Ashcroft*

*v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (holding that conduct violates clearly established

law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are]

sufficiently clear' that every 'reasonable official would have understood that what he is

doing violates that right'") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Because Mr. Theoharis's deposition testimony and declaration are sufficient

evidence from which a jury could credit his version of events, the court need not parse

the numerous other conflicts in the evidence.  The court need not, for example, square the

accounts of the Harrisons and Detective Wheeler that they heard nothing preceding the

shooting with Officer Rongen's and Detective Thompson's assertions that they were

often shouting at Mr. Theoharis.  The court need not assess whether the officers could

have engaged in the multi-part verbal exchange they describe with Mr. Theoharis in the

seconds between their descent to the lower level and the beginning of the shooting.  The

court need not decide what to make of discrepancies between the account of Officer

Rongen and the account of Detective Thompson, or discrepancies between the officers'

sometimes-competing accounts and Mr. Theoharis's account.  The court leaves those

inquiries to the jury.

## IV.  CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion for summary

judgment (Dkt. # 69) and GRANTS Defendant's motion (Dkt. # 57) in part and DENIES

it in part.  This action will proceed to trial on June 1 on Mr. Theoharis's excessive force

claim.

The court has not addressed Mr. Theoharis's invocation of the "provocation

theory," which in his view would make Officer Rongen liable for his use of force even if

it was not excessive, provided that Officer Rongen was not lawfully present in the

bedroom when he shot.  Pltf.'s Opp'n (Dkt. # 63) at 22-24.  Officer Rongen barely

ORDER – 30

mentioned the provocation theory in his reply.  It is not apparent to the court whether its conclusion that Officer Rongen has qualified immunity for his entry into Mr. Theoharis's bedroom is dispositive of any claim based on the provocation theory.  In any event, the parties' briefing gives the court no basis to address that issue.  If Mr. Theoharis intends to assert the provocation theory at trial, his counsel must inform Officer Rongen's counsel no later than March 4, 2015.

DATED this 6th day of February, 2015.


The Honorable Richard A. Jones
United States District Court Judge

ORDER – 31